## Case No. 3,270.

### The COTTON PLANTER.

[1 Paine, 23.][1]

Circuit Court, D. New York. Sept. Term, 1810.

EMBARGO—TIME OF TAKING EFFECT—FORFEITURE
—ACTION OF SECRETARY OF THE TREASURY.

1. The promulgation of laws should be such as to afford every person who is to be affected by them a reasonable opportunity of being as early as possible acquainted with them.

2. As it regards trade laws, unless previous notice of them be brought home to the party charged with violating their penal provisions, they are to be considered as beginning to operate in the respective collection districts only from the times they are received from the proper department by the collector.

3. The court in considering a question of forfeiture disregards a refusal of the secretary of the treasury to remit the penalty.

4. The embargo law was passed the 22d of December, 1807 [2 Stat. 451]. A vessel cleared out and sailed from St. Mary's, Georgia, on the 15th of January, and in the evening the collector received the information of the passage of the law, and gave public notice of it. It did not appear that it was known to the master or owners of the vessel prior to her sailing. Having been seized for a violation of the law, the court decreed her restoration.

[Appeal from the district court of the United States for the district of New York.

[Libel in admiralty by the United States against the ship Cotton Planter (Benjamin Morris and Benjamin Chase, owners).]

R. Harison, J. O. Hoffman, and B. Robinson, for appellants.

N. Sanford, D. A., for respondents.

LIVINGSTON, Circuit Justice. The libel in this case alleges that the Cotton Planter, being a ship of the United States, proceeded on the 18th of January, 1808, from St. Mary's in Georgia, to Antigua in the West Indies, contrary to the act—4 Laws U. S. 129 [1 Stat. 451]—laying an embargo on all ships and vessels in the ports and harbours of the United States; and that by reason of the premises and by force of the statute in such cases made and provided, the said ship with her tackle, &c., became forfeited. Benjamin Chase, who claims for himself and Benjamin Morris, as owners of the said ship, states in his answer, that she was cleared out on the 15th of January, 1808, in due form of law by the collector of the port of St. Mary's, for a voyage to Antigua, with a proper cargo for that island. That the same day she proceeded on her said voyage and left the territories of the United States, and having discharged the cargo she took out, she returned with another to the port of New-York. He further says that when the Cotton Planter was cleared at St. Mary's, and when she sailed from thence for Antigua, and when she quitted the territories of the United States, on that voyage, no law of the United States was known to him, or

[1] [Reported by Elijah Paine, Jr., Esq.]

to the said Benjamin Morris, or had been promulgated at St. Mary's, whereby such clearance and voyage were prohibited, or the exportation of such cargo for Antigua rendered unlawful. A replication being filed, and proofs taken, the district court, after argument, condemned the Cotton Planter as forfeited to the United States [case not reported]. From this decree an appeal was interposed to this court, on the argument of which both fact and law have been greatly controverted.

Did the claimant know of the act laying an embargo which passed the 22d of December, 1807? or of the act supplementary thereto, passed on the 9th of January, following, or had these laws been duly promulgated at St. Mary's antecedent to the clearance of the vessel from the United States? If he were ignorant of these laws, and they had not been thus previously made known at St. Mary's, is his vessel protected from forfeiture? The court, whose office it is in cases of this kind to decide the fact as well as law, is of opinion that this ignorance in the claimant was real and not affected. But did it entertain doubts on this point, considering itself bound by the same rules which govern juries in penal cases, it would acquit the owners of all knowledge of the laws in question. It is certain that the collector of the port of St. Mary's did not receive the first embargo law until the evening of the day on which the Cotton Planter was cleared at his office, nor until she had sailed beyond the jurisdiction of the United States. It is not proved that a printed or any other copy of the act had reached St. Mary's, or been published, or that the same was in any other way known there. The claimant denies such knowledge on oath; and the mate declares that at the time the vessel sailed he had never heard of any act of congress laying an embargo, and that he does not believe the owners had. Several witnesses also who reside in Port St. Mary's, and who have been examined under a commission, testify that they knew nothing of the act until the collector's publication of it in the market, which was on the 16th of January, 1808. If then the law was not published at St. Mary's, and not known even to the collector, why impute without proof a knowledge of it to the claimant? Although rumours may have reached St. Mary's of such an act prior to the 15th, there could be no reason for the merchants there suspending their ordinary business until the truth of them could be known. It appears, indeed, from his letter to the secretary of the treasury, that the collector of that port believed, after the vessel had sailed, that the claimant knew of the act when he obtained a clearance; but all his information being hearsay, whatever credit the secretary of the treasury might very properly be disposed to give to it, the rules of evidence compel this court to pass it by as no testimony. The persons from whom his informa-

tion was received, should have been examined. The fact then, on which the defence rests being satisfactorily established, it remains to see what influence it is to have on this prosecution.

On the part of the United States it is said, that ignorance is no excuse; that every man is bound, or at least presumed, to know the law; that such an inquiry is therefore never made, and would, if tolerated, lead to uncertainty and introduce incalculable mischiefs. That if ignorance be allowed as an excuse in one case, it must be in another; by which means the ignorant members of a community, who are as apt as any to commit offences, would generally escape with impunity. That there is power in the secretary of the treasury to relieve in case of an unintentional violation of laws relative to trade, and therefore the less occasion for the interposition of the judiciary; that the secretary has refused relief here, because he considered the alleged ignorance of the claimant a mere pretence.

The court will not dispute the correctness of any of these principles, but it is much doubted whether they apply to this case. We are not inquiring whether ignorance of a law is ever to be received as an excuse, but at what time an act of congress is to be considered as having the force of a law within a particular district. The act under consideration, it is said, is silent as to the time of its commencement. It neither fines on any particular day, nor is it declared in terms that it shall be in force from and after the passing thereof. It is unnecessary therefore to decide whether congress has it not in their power by express provisions for the purpose to pass a law of the most penal nature, which shall go into operation in every part of the United States on the very day on which it receives the president's sanction. This law has no such provisions; and therefore in settling the time of its commencement, the court is not required to encroach upon the province of the legislature, or to interfere with any of its proceedings; an office at all times of high delicacy, and which no court would enter upon without great reluctance, and extreme circumspection. But whether a law thus worded be in force throughout the United States on the day of its passage, or not until after a reasonable time for promulgation of it in the different parts of the Union, is a question purely of judicial cognizance, and may be decided without interfering with any other department of government; and this again resolves itself into the simple question, whether in a case like this any promulgation is necessary. A more abject state of slavery cannot easily be conceived, than that the legislature should have the power of passing laws inflicting the highest penalties, without taking any measure to make them known to those whose property or lives may be affected by them. It is not only necessary, therefore, in a country governed by laws, that they be passed by

the supreme or legislative power, but that they be notified to the people who are expected to obey them. The manner in which this is done may vary; but whatever mode is adopted, it should be such as to afford a reasonable opportunity to every person who is to be affected by them, of being as early as possible acquainted with them. "Whatever way is made use of, it is incumbent on the promulgators," says the learned commentator on the laws of England, "to do it in the most public and perspicuous manner." The court will not stop to inquire in what manner the laws of congress, relating to different subjects, should be promulgated, or whether a mere deposite of them in the proper office, after a reasonable lapse of time, would not amount to a sufficient notification. But as it regards laws of trade, which is the case before it, rendering penal acts, although sanctioned by former laws, and done in concurrence and with the consent of its own officers, the court thinks it cannot greatly err in saying, that such laws should begin to operate in the different districts only from the times they are respectively received, from the proper department, by the collector of the customs, unless notice of them be brought home in some other way to the person charged with their violation. A proposition so reasonable, and so consonant to those principles of justice and humanity which are unchangeable, requires only to be stated to receive our universal assent. That a law which passes at Washington should subject to forfeiture every vessel which sailed from the United States on the very day of its passage or the day after, however remote the port of departure, and after a regular clearance by the authorized agent of government, is a doctrine leading to such unjust and tyrannical consequences, that nothing but a course of decisions, whose meaning admitted of no doubt, could induce this court to sanction it. There may be a difference in name, but there is none in reality, between an ex post facto law, which congress cannot pass, and one whose operation is to be so universal and instantaneous. The position that the law intends every person to have notice of what is done in parliament, as soon as it is concluded, because the whole realm is there represented, is too quaint to require refutation. Indeed, the same learned writer, who would very gravely persuade us that a merchant in Boston, at the distance of five hundred miles, must know every law of congress, the moment it is passed, merely because he may have had a voice in the choice of a few representatives, who may all have voted against it, as if not satisfied with his own reasoning, and feeling, no doubt, the propriety of affording to the subject some other and better means of information, tells us, that he had found upon examination, that not long after the art of printing found its way into England, which was between three and four hundred years ago, the practice had

been to publish acts of parliament in the counties, to the end "that the subjects might have express notice thereof, and not be overtaken by an intendment in law." For this purpose he mentions, that at every parliament the acts passed were transcribed on parchment, and by the king's writ, which was either in Latin or French, directed to the sheriff of every county, commanding him to proclaim the same in all places throughout his whole bailiwick when he should think most fit, and see that they were firmly observed and kept. Now this practice, which we have on such high authority, together with the forms of the writs which were used, is considered as furnishing better evidence of the ancient common law of England than any of the modern decisions which have been referred to; and although it is no reason for insisting on a similar mode of promulgating acts of congress by proclamation, it is abundantly sufficient, were any authority necessary, to show that in some way or other some notification must take place previous to their operation. And if such promulgation be at all necessary, it is as clear that one made at one port is not enough to bind the citizens at another, unless after a lapse of time at least sufficient to convey the intelligence thither. But whatever mode may be best suited to other laws, the practice of our government has not left us in the dark as to the manner in which laws of this nature should be promulgated. It has been its invariable practice, if my information be correct, to transmit them to the different collectors, with or without instructions from the treasury department, as to the manner of their execution. When the inquiry then is thus limited to the time of its reception by a particular collector, none of that uncertainty will follow, which is so much deprecated by the district attorney. From that time, and not till then, should the rule of ignorantia legis neminem excusat be enforced; and such, if this court be not greatly mistaken, is the meaning of it; not that a party shall suffer, notwithstanding his ignorance of a law with which he had no means of becoming acquainted, or which it was impossible for him to know; but that when this opportunity has once been afforded, the law properly presumes that every person knows or may know it, and therefore shuts its ears against every allegation to the contrary. It must have been with the same understanding of this rule, that Mr. Justice Blackstone remarks, that "all laws should be made to commence in futuro, and be notified before their commencement, which is implied in the term prescribed; but when this rule is in the usual manner notified, or prescribed, it is then the subject's business to be thoroughly acquainted therewith; for if ignorance of what he might know were admitted as a legitimate excuse, laws would be of no effect, but might always be eluded with impunity." To the rule thus modified no objection lies. But to

give it the sense which the respondents put upon it, would interfere with another maxim at least as ancient and more self-evident—which is, that the law never compels a man to do an impossibility—"lex neminem coget ad impossibilia." No man in England is bound to observe an act of parliament impossible to be performed. Why then should he be compelled here to as great an impossibility, that of conforming his conduct to a rule which he had no opportunity of being acquainted with?

It has thus far been supposed, that the act laying an embargo contains no provision as to the time of its commencement, and, the argument at the bar proceeded on that ground; but it is not very clear that it is altogether silent in this respect. With regard to foreign vessels, it is provided, that they may depart with the cargo which they have on board when notified of the act. This not only determines its commencement as to foreign vessels, but by implication at least as to our own also. It is equivalent to saying, that no vessel of the United States, although cleared, should be permitted to depart after being notified of the act. The president also is authorized to give such instructions to the officers of the revenue as shall appear best adapted for carrying the act into effect; thereby again implying that it was to have no force in the different districts until promulgated at the custom houses. A great many vessels must have sailed from the United States after the passing of this law, and previous to its being received by the different collectors, but no mention has been made of the seizure or condemnation of any such vessel. Nor is there any doubt that the secretary of the treasury would have remitted the forfeitures, if any had accrued, if he had been satisfied of the bona fides of the transaction. As the decision of that gentleman has been incorporated with the proceedings in this cause, and has in some way or other come up with the appeal, it may be thought by some that this court thinks itself competent to reverse what he has done. The court disclaims any such right. It is not now examining or revising what he has done, but whether a forfeiture has been incurred; not whether the penalty should be remitted, but whether it ever attached. If the penalty were incurred, it would have nothing to do but to say so, and leave it to the department to which the law has assigned it to determine on its remission. After the condemnation of the Cotton Planter in the district court, the claimant, agreeably to the act of March 3, 1797 (4 Laws U. S. 585; [1 Stat. 506, § 1]) presented his petition to that court in order to obtain a remission of the penalty by the secretary of the treasury. A statement of facts, with an expression of the favourable opinion of the court, was transmitted to the secretary of the treasury, (Mr. Gallatin) who refused to remit the penalty. All the papers relating to this proceeding were sent up

to the circuit court as a part of the transcript.

Upon the whole, as the act laying an embargo contains no express provision as to the time of its commencement, and as it appears that the law was not received or promulgated at the custom-house at St. Mary's, nor in any other way made known to the inhabitants of that port, or to the claimant himself, before the clearance and sailing of the Cotton Planter, this court is of opinion that no forfeiture has accrued, and that therefore the judgment of the district court must be reversed.